## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | NO. 1:13-cr-00002-WSD-RGV |
| | : | |
| ADAM GHANI BELTRAN, a.k.a. | : | |
| Abdelghani Meskini, a.k.a. | : | |
| Eduardo Rocha, a.k.a. "Johnny" | : | |

## MAGISTRATE JUDGE'S FINAL REPORT,
## RECOMMENDATION, AND ORDER

Defendant Adam Ghani Beltran ("Beltran")[1] is charged with unlawful

possession of a Taurus .38 caliber firearm following a felony conviction, in violation

of 18 U.S.C. § 922(g)(1). [Doc. 1]. Beltran has filed a motion to dismiss the

indictment, alleging a violation of his Sixth Amendment right to a speedy trial, [Doc.

32], which the government opposes, [Doc. 42]. Beltran filed a reply, [Doc. 47],[2] and

---

[1] On April 7, 2006, Beltran legally changed his name from Abdelghani Meskini ("Meskini") to Adam Ghani-Beltran. [Doc. 42-2 at 2-3]. Although many of the exhibits submitted by the parties refer to Beltran by his birth name, Meskini, for purposes of the present motion, the Court will refer to him as Beltran. The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] On June 8, 2017, the government filed a motion for leave to file a sur-reply to Beltran's reply brief, [Doc. 50], and although "[n]either the Federal Rules nor the Court's Local Rules allow sur-reply briefs as a matter of right, and the Court normally does not permit sur-replies," USMoney Source, Inc . v. Am. Int'l Specialty Lines Ins. Co., No. 1:07-cv-0682-WSD, 2008 WL 160709, at *2 n.5 (N.D. Ga. Jan. 15, 2008), rev'd on other grounds, 288 F. App'x 558 (11th Cir. 2008) (per curiam)

for the reasons that follow, it is **RECOMMENDED** that Beltran's motion to dismiss the indictment, [Doc. 32], be **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 10, 2009, Beltran, a native and citizen of Algeria, was taken into custody by Immigration and Customs Enforcement ("ICE") and served with a Form I-851, Notice of Intent to Issue a Final Administrative Removal Order, based on his aggravated felony convictions. [Doc. 45-1 (Ray Decl.) at 2 ¶ 6; Doc. 45-2].[3] Beltran did not contest that he was subject to removal, but he requested a withholding or deferral of removal to Algeria and Morocco under the Convention Against Torture ("CAT"). [Doc. 32-3 at 7-8; Doc. 45-2 at 3]. On November 25, 2009, ICE issued a

_____

(unpublished) (citation omitted); see also Leatherwood v. Anna's Linens Co., 384 F. App'x 853, 857 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted), "the Court may in its discretion permit the filing of a surreply . . . where a valid reason for such additional briefing exists, such as where the movant raises new arguments in [his] reply brief," Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005 ) (citations omitted). The government seeks leave to file a sur-reply to address arguments raised by Beltran for the first time in his reply brief. See [Doc. 50]. Accordingly, the government's motion for leave to file a sur-reply, [Doc. 50], is **GRANTED**, and the Court will consider the sur-reply brief contained within the government's motion in ruling on Beltran's motion to dismiss the indictment.

[3] In particular, on January 23, 2004, Beltran pled guilty to an eight-count indictment, including a terrorism-related offense, in the United States District Court for the Southern District of New York, and he was sentenced to concurrent terms of imprisonment of 60 months on counts 1 and 2 and 72 months on counts 3 through counts 8, followed by five years of supervised release, and he was ordered to pay restitution. [Doc. 45-1 at 2 ¶ 4; Doc. 45-8 at 3-4].

Form I-851A, Final Administrative Removal Order, finding Beltran "deportable as charged" to Algeria, but withholding execution of the order until Beltran could be interviewed about his application for deferral of removal under CAT.  [Doc. 45-1 at 2 ¶ 7; Doc. 45-3].[4]

On March 18, 2010, the United States Probation Office for the Southern District of New York filed a petition to revoke Beltran's supervised release, and based on this petition, the United States District Court for the Southern District of New York issued a warrant for his arrest.  [Doc. 45-1 at 3 ¶ 9]; see also [Docs. 42-3 & 42-5].  On March 24, 2010, the United States Marshals Service took custody of Beltran, and as a result, the proceedings before the Immigration Court in Atlanta, Georgia, were administratively closed on April 1, 2010.   [Doc. 45-1 at 3 ¶ 10; Doc. 42-4]. Subsequently, on October 27, 2010, the United States District Court for the Southern District of New York concluded that Beltran had violated the terms of his supervised release by attempting to possess a firearm in the spring or summer of 2007, attempting to purchase an AK-47 assault rifle in the summer or fall of 2009, associating with another felon from 2006 to November 2009, and making false statements in late 2009, among other violations, and he was sentenced to a term of

---

[4] On December 9, 2009, an asylum officer conducted an interview related to Beltran's opposition to his removal, and on March 3, 2010, Beltran was referred to the Immigration Court in Atlanta, Georgia, for consideration of his application for deferral of removal under CAT.  [Doc. 45-1 at 3 ¶ 8].

imprisonment of 31 months to be followed by another period of supervised release. [Doc. 42-5 at 3-4; Doc. 45-1 at 3 ¶ 11].

On June 22, 2012, Beltran was returned to ICE custody, and on June 26, 2012, ICE filed a motion with the Immigration Court in Atlanta to re-calendar the proceedings and to transfer the venue to the Stewart Immigration Court, which was granted on August 16, 2012.  [Doc. 45-1 at 3 ¶ 13].[5]  During the pendency of the immigration proceedings and while Beltran was in the custody of the Department of Homeland Security ("DHS"), a federal grand jury in the Northern District of Georgia returned the instant indictment on January 3, 2013, charging that Beltran unlawfully possessed a firearm from the fall of 2007 through February 1, 2008, after having been convicted of a felony offense, in violation of 18 U.S.C. § 922(g).  [Doc. 1].  The indictment was initially filed under seal, see [Docs. 3 & 4], but subsequently unsealed on June 2, 2014, see [Docs. 6 & 7]; see also [Docket entry dated 06/02/2014.  An arrest warrant was issued upon the return of the indictment in 2013, [Doc. 5], but Beltran remained in DHS custody.

On March 12, 2013, the Immigration Court conducted a merits hearing on Beltran's application for asylum and withholding of removal, during which he explained his reasons for opposing removal to Algeria, but he consented to removal

---

[5] On August 23, 2012, Beltran was served with the November 25, 2009, Final Administrative Removal Order.  [Doc. 45-3].

to Morocco, where Beltran claimed to have derivative Moroccan citizenship through his father, who was a Moroccan national. [Doc. 45-4; Doc. 45-1 at 4 ¶ 17]. On June 13, 2013, the Immigration Judge ("IJ") issued a decision, denying Beltran's requested relief for CAT protection, though the IJ found that he was eligible for deferral of removal to Algeria under CAT, and ordering him removed to Morocco. [Doc. 45-4; Doc. 45-1 at 4 ¶ 18]. ICE filed a motion to reconsider on June 24, 2013, requesting that the IJ amend the June 13 order to conform with immigration regulations, and on this same day, the IJ issued an amended decision granting Beltran's application for deferral of removal to Algeria under CAT, but denying the application as to Morocco. [Doc. 45-1 at 4 ¶¶ 19-20; Doc. 45-5]. ICE appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). [Doc. 45-1 at 4 ¶ 20].

On August 8, 2013, ICE provided Beltran with a travel document packet for Morocco and asked him to complete the packet and provide information regarding his father's Moroccan citizenship, and on August 27, 2013, ICE mailed the travel document request to the Moroccan Consulate. [Id. at 4 ¶¶ 21-22]. ICE contacted the Moroccan Consulate on October 31 and November 1, 2013, to request an update on the status of the travel document request, [id. at 4 ¶¶ 23-24],[6] and on March 12 and

---

[6] On December 19, 2013, the BIA issued a decision dismissing ICE's appeal, but vacating as *ultra vires* the IJ's order that Beltran be removed to Morocco, reminding ICE that it retained the authority to remove him to any safe country other than Algeria, [Doc. 45-1 at 4-5 ¶ 26; Doc. 32-3 at 10 ¶ 35; Doc. 32-4 at 5; Doc. 37-1],

May 12, 2014, Beltran was issued a Form I-229(a), Warning for Failure to Depart, setting forth the consequences of failing in good faith to assist in obtaining travel documents and for taking any action designed to prevent or hamper the issuance of such travel documents, [Doc. 45-6 (Ray Supp. Decl.) at 5 ¶¶ 30-31].  On May 22, 2014, ICE received an e-mail from the Moroccan Consulate in New York, indicating that a travel document could not be issued to Beltran without a Moroccan identification document or documentation proving his citizenship.[7]  [Id. at 5 ¶ 32; Doc. 42-11].  At the end of May 2014, ICE requested assistance from the Headquarters Enforcement and Removal Operations Travel Document Unit ("TDU"), with securing travel documents for Beltran, and the TDU subsequently coordinated with other agencies in an effort to contact and interview Beltran's family members and to obtain

_____

and following a hearing by the Immigration Court on January 13, 2014, the IJ issued a decision, granting Beltran's application for deferral of removal to Algeria under CAT, which became final on February 13, 2014, [Doc. 45-1 at 5 ¶ 28; Doc. 32-3 at 10 ¶ 36; Doc. 32-4 at 5].  On February 18, 2014, Beltran filed a *pro se* petition for writ of habeas corpus in the Middle District of Georgia, and after he was appointed counsel in October of 2014, he amended his petition, alleging that his indefinite confinement was unconstitutional.  See [Doc. 42-18]; see also Meskini v. Holder, Civil Action No. 4:14-cv-00042-CDL-MSH, at [Docs. 1 & 33] (M.D. Ga. 2014).

[7] The Moroccan Consulate's e-mail appeared to be based on Beltran's statement in an August 2013 declaration that he had never been issued any type of identification documentation from the Moroccan government, but ICE had previously obtained two letters written by Beltran in January of 2010, in which he wrote the Consulate of Morocco in New York and the Embassy of Morocco in Washington, D.C., and advised each that he had received a Moroccan identification card in the 1990 to 1991 time frame.  [Doc. 45-6 at 5-6 ¶ 33; Docs. 42-8, 42-9, & 42-10].

documents to verify Beltran's derivative Moroccan citizenship. [Doc. 42-12 (Gephart Decl.) at 3 ¶¶ 9-10; Doc. 42-13 (Soto Decl.) at 2 ¶ 5].[8]   TDU located Beltran's father in Algeria, and in November 2014, officials contacted him by telephone and attempted to arrange an in-person interview,[9] but subsequent attempts to reach Beltran's father were unsuccessful.  [Doc. 42-13 at 2 ¶ 6].

In March and April of 2015, United States officials requested assistance from the Government of Algeria in locating and interviewing Beltran's father, and the Government of Algeria agreed to assist.  [Id. at 3 ¶ 7].  ICE believed that officials from the Government of Algeria made contact with Beltran's father and that his father provided certain documents, and on September 7, 2015, the United States Embassy in Algiers sent a Diplomatic Note to the Ministry of Foreign Affairs, requesting details about the contact with Beltran's father.  [Id. at 3 ¶ 8].  While efforts were still ongoing to secure travel documents for Beltran's removal to Morocco, a status conference was held on Beltran's habeas petition in the Middle District of Georgia on November 18, 2015.  [Doc. 42-14].

---

[8] On June 12, 2014, Special Agents with the Federal Bureau of Investigation ("FBI") met with Beltran and during the interview, the agents showed him a copy of the arrest warrant issued in the Northern District of Georgia for the charge in the instant indictment.  [Doc. 42-17].

[9] TDU had reason to believe that Beltran's father had documents in his possession that would establish Beltran's Moroccan citizenship.  [Doc. 42-13 at 3 ¶¶ 8-9].

During this status conference, the Honorable Stephen Hyles ("Judge Hyles"), United States Magistrate Judge for the Middle District of Georgia, observed that Beltran "want[ed] to enjoy his liberty somewhere other than Algeria" and that the "United States [did] not want to hold him for any particular reason" and "want[ed] him to enjoy his liberty somewhere other than the United States," but that he had "one impediment with [the] pending indictment in the Northern District" and that it "seem[ed] . . . unfair to hold him for a certain period of time, and then right when he expect[ed] the door to come open, the U.S. Marshal Service [would] gather[] him up and take[] him to Atlanta[.]"   [Id. at 9].   The government explained that the indictment had been unsealed and was on the record and that its "position [was] that if [the] Court grant[ed Beltran's] habeas petition and his immigration detention must end, the Marshals [would] . . . take him into custody pursuant to his indictment [] in the Northern District of Georgia, and he [would] [] then [be] prosecuted." [Id. at 9-10 (emphasis omitted)].   In response to Judge Hyles' question about why the government was not attempting to resolve the firearm charge in the Northern District while the habeas petition was pending, the government further explained that there were "a lot of cooks in the kitchen and a lot of decisions the government[ was] making in its discretion" and that the "plan [was] to keep [Beltran] in detention until such time as he's removed from the United States

because . . . he's an especially dangerous alien that cannot be on the street" and "however we need to do that, the United States [was] prepared to do it," but that "we prefer[red] just to get him out of the United States, and he can have his life wherever else he want[ed] to go" and "maybe we'll never prosecute him[] [b]ut if we have to pull that card out of the deck, then . . ." [Id. at 10-11]. The government confirmed that it was "a tactical consideration the United States [would] make when required to do so." [Id. at 11].[10]

---

[10] During the conference, Beltran's counsel also advised the Court that Beltran was amenable to being removed to Kuwait, explaining that his common law wife held dual citizenship in Kuwait and the United States. [Doc. 42-14 at 11-12]. However, Beltran's counsel subsequently advised the Court during another status conference held on September 13, 2016, that Kuwait was no longer an option because Beltran's common law wife did not want to marry him, nor was she a citizen of Kuwait. [Doc. 42-15 at 7-8]. Additionally, "the government received an attestation from the Moroccan Consulate in Algeria, affirming that [Beltran's] mother was, in fact, born in Morocco." [Id. at 10]. As a result, ICE reached out to its attaché in France "to assist in trying to find out the nationality and prove the nationality of [Beltran's] father," since it was "believe[d] that France would have biographical documents of . . . people born in Morocco or citizen or naturalized in Morocco," which was at one time a French Protectorate. [Id. at 12]. During the September 2016 status conference, the government also explained that Beltran's father had failed to respond to questions regarding his biographical information. [Id. at 10]. The government further noted that Beltran was not cooperating and that he continued his efforts "to thwart his removal" to Morocco, [id. at 12, 14-15, 18-21], a contention that was disputed by defense counsel, see [id. at 14-15]. In an effort to help determine whether Beltran was thwarting his own removal, Judge Hyles inquired as to whether ICE could meet with Beltran to obtain the missing information regarding his father's citizenship, and Beltran's attorney indicated that he did not think Beltran would object to that. [Id. at 24-25].

On December 21, 2016, Judge Hyles issued a Report and Recommendation, recommending that Beltran's amended petition for a writ of habeas corpus be granted and that he be released from ICE custody, subject to an order of supervision. See [Doc. 32-4].  On January 3, 2017, Beltran was arrested pursuant to the arrest warrant from the Northern District of Georgia issued in January 2013 based on the pending indictment.  See [Doc. 24].  On February 27, 2017, Beltran filed the motion to dismiss the indictment, [Doc. 32], which the government opposes, [Doc. 42]. Beltran has filed a reply in support of his motion, [Doc. 47], to which the government has filed a sur-reply, [Doc. 50 at 2-7].

## II.  DISCUSSION

Beltran moves to dismiss the indictment due to the lengthy delay between the January 2013 indictment and his January 2017 arrest, which he asserts violates his right to a speedy trial pursuant to the Sixth Amendment of the United States Constitution.  See [Doc. 32 at 7-8].  In response, the government contends that there was a valid reason for the delay, that Beltran "acquiesced in the delay to assert his speedy trial right," and that Beltran cannot show he suffered actual prejudice as a consequence of the delay.  [Doc. 42 at 11-21].

"The federal constitution guarantees the right to a speedy trial." United States v. Treisback, Criminal Action No. 2:12–CR–00026–RWS, 2014 WL 2003031, at *4

(N.D. Ga. May 14, 2014), adopted at *1 (citations and internal marks omitted). "Sixth Amendment speedy trial rights attach at the time of arrest or indictment, whichever comes first, and continue until the date of trial." Id. (citations and internal marks omitted). "A defendant's Sixth Amendment right to a speedy trial cannot be quantified into a specific number of days or months," but "must be evaluated under the particular circumstances of each case using a balancing test which weighs the conduct of both the government and the defendant." United States v. Spaulding, 322 F. App'x 942, 945 (11th Cir. 2009) (per curiam) (unpublished) (citation omitted).

The Supreme Court has established four factors to be considered in deciding whether a defendant's constitutional right to a speedy trial has been violated: "(1) whether the delay before trial was uncommonly long; (2) whether the government or the defendant is more to blame for that delay; (3) whether, in due course, the defendant asserted his right to a speedy trial; and (4) whether the defendant suffered prejudice as a result of the delay."[11] United States v. Duke, Criminal Action No. 4:11–CR–004–HLM–WEJ, 2011 WL 1811439, at *2 (N.D. Ga. Apr. 27, 2011), adopted

---

[11] The first factor of the balancing test, the length of the delay, "serves as a double inquiry" in that first, it is a "threshold inquiry that the defendant must satisfy in order for [the court] to weigh the remaining three factors," and second, the court must "examine[] the extent to which the delay stretches beyond the bare minimum needed to satisfy the threshold showing of presumptive prejudice." United States v. Villarreal, 613 F.3d 1344, 1350 (11th Cir. 2010) (citations and internal marks omitted).

by 2011 WL 1833213, at *5 (N.D. Ga. May 12, 2011) (footnote and citation omitted) (citing <u>Barker v. Wingo</u>, 407 U.S. 514, 530 (1972)); <u>see also</u> <u>United States v. Cruz</u>, No. 16-11181, 2017 WL 894439, at *3 (11th Cir. Mar. 7, 2017) (per curiam) (unpublished) (citations omitted); <u>United States v. Lamar</u>, 562 F. App'x 802, 805 (11th Cir. 2014) (per curiam) (unpublished) (citations omitted); <u>United States v. Bibb</u>, 194 F. App'x 619, 622 (11th Cir. 2006) (per curiam) (unpublished) (citation omitted).  "When balancing the *Barker* factors, courts must articulate how heavily each factor weighs against the identified party."  <u>Duke</u>, 2011 WL 1811439, at *3 (internal marks omitted) (quoting <u>United States v. Ingram</u>, 446 F.3d 1332, 1336 (11th Cir. 2006)).  And, "[i]n the Eleventh Circuit, a defendant generally must show actual prejudice unless the first three factors . . . all weigh heavily against the government."  <u>Id.</u> (last alteration in original) (citations and internal marks omitted); <u>see also</u> <u>Bibb</u>, 194 F. App'x at 622 (citation omitted).

The government concedes that the delay in this case between the return of the indictment in January 2013 and Beltran's arrest in January 2017 is presumptively prejudicial, <u>see</u> [Doc. 42 at 10-11]; <u>see also</u> <u>Ingram</u>, 446 F.3d at 1336 (citations and internal marks omitted) ("Delays exceeding one year are generally found to be presumptively prejudicial."), and that this factor therefore weighs in Beltran's favor. However, the government maintains that the second factor, the reason for the delay,

"[i]n the very least, [] constitutes a neutral reason justifying the delay," but that even if the Court finds it weighs in Beltran's favor, it does not weigh heavily against the government, and the third factor likewise does not weigh heavily against it, but rather weighs heavily against Beltran.  See [Doc. 42 at 11-19].  Because the threshold inquiry has been satisfied by the length of the post-indictment delay, the Court turns to the second and third Barker factors.  See United States v. Knight, 562 F.3d 1314, 1323 (11th Cir. 2009) (citation omitted).

## A.   The Reason for the Delay

"The government bears the burden of explaining the reason for the delay." Spaulding, 322 F. App'x at 945 (citation omitted).  "Different reasons for delay are accorded different weight in the *Barker* analysis," and therefore, "the reasons for delay must be carefully analyzed to see who created the delay and whether that delay was an unacceptable manipulation or an acceptable incident of the criminal process."  United States v. Jones, No. 1:05-cr-617-WSD, 2007 WL 2071267, at *21 (N.D. Ga. July 19, 2007), adopted at *3 (citations omitted); see also United States v. Schlei, 122 F.3d 944, 987 (11th Cir. 1997).  In analyzing the second factor, the Eleventh Circuit has noted that "[g]overnment actions that are tangential, frivolous, dilatory, or taken in bad faith weigh heavily in favor of a finding that a speedy trial

13

violation occurred."[12] Bibb, 194 F. App'x at 622 (alteration in original) (citation and internal marks omitted). However, "delays that occur for valid reasons . . . will not be accorded heavy weight against the [g]overnment," and "negligence is a more neutral act that should not be weighed as heavily as bad faith." Id. (citations and internal marks omitted). That is, "[b]etween diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground," and "[a]lthough negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." Doggett v. United States, 505 U.S. 647, 656-57 (1992). "And such is the nature of the prejudice presumed that the weight [the court] assign[s] to official negligence compounds over time as the presumption of evidentiary prejudice grows," and the "toleration of such negligence varies inversely with its protractedness, and its consequent threat to the fairness of the accused's trial." Id. at 657 (internal citation omitted). However, "[t]o be sure, to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice." Id.; see also United States v. Harris, 376 F.3d 1282, 1290 (11th Cir. 2004) (citation omitted)

---

[12] "For example, the government may not deliberately delay a trial in order to weaken a defendant's case." Spaulding, 322 F. App'x at 946 (citation omitted).

("Nonetheless, the Supreme Court has recognized that a defendant generally cannot establish a Sixth Amendment speedy trial claim, however long the delay, if the government pursued the prosecution with 'reasonable diligence,' and the defendant fails to show that the delay resulted in 'specific prejudice to his defense.'").

The government maintains that it had a valid reason for the delay, namely, that Beltran "was in another district, the Middle District of Georgia, in the custody of another agency, the [DHS], that was attempting to remove [him] from the United States, and thus avoid his continued incarceration altogether." [Doc. 42 at 12 (citations omitted)]. In addition, the government points out that "the delay that resulted from allowing DHS to continue with its efforts to remove Beltran was not motivated by bad faith, harassment, or a government desire to seek a tactical advantage," [id. at 13 (citation and internal marks omitted)], and that it, in fact, "derived no tactical advantage or any other advantage, nor did it intend to do so, while Beltran was in DHS custody," [id.]. For the reasons that follow, the Court agrees.

Beltran asserts that the "nine-year pre and post-indictment delay are attributable to the government's conscious plan to detain Beltran in the event of habeas relief from indefinite immigration detention."[13] [Doc. 32 at 7 (emphasis

---

[13] Generally, "[o]nly pretrial delay following a person's arrest, charge, or indictment is relevant to whether the Speedy Trial Clause of the Sixth Amendment

omitted)].   Aside from the fact that the grand jury returned the instant indictment

---

is triggered," but "once the Sixth Amendment's speedy trial analysis is triggered, it is appropriate to consider inordinate pre-indictment delay in determining how heavily post-indictment delay weighs against the Government." Ingram, 446 F.3d at 1339 (citations omitted).  Thus, while pre-indictment delay may still be considered in the Barker analysis for post-indictment delay, to the extent Beltran argues for dismissal based only on inexcusable pre-indictment delay, his argument is without merit.  "The statute of limitations is the primary safeguard against the government bringing stale criminal charges, but when a defendant establishes substantial prejudice, due process may require the dismissal of an otherwise timely indictment if the delay was the product of a deliberate act by the government to gain a tactical advantage." United States v. Ramirez, 491 F. App'x 65, 70 (11th Cir. 2012) (per curiam) (unpublished) (internal citations omitted).  That is, to prevail on a due process violation claim, Beltran must show that "pre-indictment delay (1) caused actual prejudice to the conduct of his defense, *and* (2) was the product of deliberate action by the government designed to gain a tactical advantage," United States v. Jones, 592 F. App'x 920, 921 (11th Cir. 2015) (per curiam) (unpublished) (emphasis added) (citation omitted), and "the law in this circuit is that prejudice will not be presumed because of a lengthy delay," United States v. Williams, Criminal Case Nos. 1:11–CR–547–ODE–ECS, 1:12–CR–80–ODE–ECS, 2012 WL 5845004, at *1 (N.D. Ga. Nov. 16, 2012) (citations and internal marks omitted).  And, with respect to the second prong, "simply gaining a tactical advantage is not enough" as the "tactical advantage must be the result of deliberate action by the government toward that end." Jones, 592 F. App'x at 922 (citation omitted).  "Both prongs of [the] test must be satisfied to make relief available to a defendant[.]" United States v. Hawes, No. 5:14–CR–397–RDP–TMP, 2015 WL 4067331, at *2 (N.D. Ala. July 1, 2015) (citation omitted).  In fact, "so 'rare' are dismissals for pre-indictment delay that [the Eleventh Circuit] once remarked that it had 'never concluded that such a dismissal was appropriate.'" United States v. Stoll, No. 10–60194–CR, 2011 WL 939251, at *7 (S.D. Fla. Feb. 16, 2011), adopted by 2011 WL 765949, at *1 (S.D. Fla. Feb. 25, 2011) (quoting United States v. Foxman, 87 F.3d 1220, 1224 n.4 (11th Cir. 1996)).  Because Beltran "must demonstrate *actual* prejudice and not merely the real possibility of prejudice inherent in any extended delay," United States v. Heard, No. 1:12–cr–40 (WLS), 2013 WL 1966299, at *3 (M.D. Ga. May 10, 2013) (citations and internal marks omitted), and he has failed to do so, as discussed more fully herein, any argument for dismissal based solely on pre-indictment delay is without merit.

in January 2013, see [Doc. 1], well before Beltran filed a petition for habeas relief in February 2014, see [Doc. 42-18], Beltran's argument in this regard solely relies on the government's representations to Judge Hyles during the status conference on the habeas petition that it made a discretionary decision to pursue Beltran's removal from the United States and to keep him detained while doing so, as the priority was to have him removed from this country, and he could then "have his life wherever else he want[ed] to go," but that if he was released, then it would have to make a "tactical consideration" to prosecute him on the indictment in the Northern District of Georgia and have the Marshals take him into custody on the firearm charge, since he was "an especially dangerous alien that [could not] be on the street" and however the government "need[ed] to do that, [it was] prepared to do it," though the preference was to have him removed.  [Doc. 42-14 at 9-11].

"When an alien who has no lawful right to be in the United States is found in this country, ICE may remove and deport that person under the authority of the INA," or "[a]lternatively, if such an alien is believed to have committed a federal offense . . . ICE may choose to postpone the removal and deportation of that person while the U.S. Attorney's Office brings a criminal prosecution," but "[w]hich pathway to take in any given case is a policy decision, and it is for the Executive Branch to determine."  United States v. Blas, No. CRIM. 13–0178–WS–C, 2013 WL

5317228, at *8 (S.D. Ala. Sept. 20, 2013) (citation and internal marks omitted); see also

United States v. Valadez-Lara, No. 3:14 CR 204, 2015 WL 1456530, at *4 (N.D. Ohio

Mar. 30, 2015) (citation and internal marks omitted) (noting that the "Executive

Branch ha[d] a choice to make" in that "it may either take Defendant into custody

for the purpose of removing him or it may temporarily suspend removal while

criminal proceedings are carried out," but that if "ICE were to take custody of

Defendant for the purposes of removal, as statutorily authorized, [the] Court could

not prevent it").[14]  And, "immigration authorities, whether the Attorney General or

someone acting under the authority of the Secretary of [DHS], cannot be compelled

---

[14] Indeed, once an alien has been issued an administratively-final removal order, DHS "shall" remove him from the United States within 90 days, and during this 90-day period, DHS "shall" detain him and the possibility of arrest by another agency or even the possibility of future imprisonment "is not a reason to defer removal."  See 8 U.S.C. § 1231(a)(1)(A), (a)(2), (a)(4)(A).  In fact, "a district court cannot interrupt removal proceedings or DHS's efforts to execute a removal order," and "once the Executive Branch makes an election to proceed with the removal proceedings, the prosecution cannot stand."  United States v. Resendiz-Guevara, CASE NO: 2:15-cr-66-FtM-29CM, 145 F. Supp. 3d 1128, 1137 (M.D. Fla. 2015), adopted at 1130 (citation and internal marks omitted).  Moreover, Beltran's reliance on the Interstate Agreement on Detainers Act ("IADA"), 18 U.S.C. Appendix, and the Immigration and Nationality Act, 8 U.S.C. 1228, is misplaced.  See [Doc. 32 at 14].  As the government correctly contends, [Doc. 42 at 14], "the IADA is by its nature an agreement among the governments of member states and the United States; it does not apply to transfers of prisoners within the federal system," Hunter v. Samples, 15 F.3d 1011, 1012 (11th Cir. 1994) (per curiam) (citations omitted).  Similarly, the provision of the INA cited by Beltran pertaining to expedited removal proceedings at DHS processing centers does not "create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person."  8 U.S.C. § 1228(a)(1).

to return [a defendant] to U.S. Marshal[s'] custody in the event he is ordered by immigration authorities to be removed from the United States." United States v. Ong, 762 F. Supp. 2d 1353, 1359 (N.D. Ga. 2010), adopted at 1354.[15]

While Beltran is correct and the government made a conscious decision to pursue his removal from this country before pursuing the prosecution on the instant indictment, "there is no evidence that the government ever acted in bad faith to gain a tactical advantage over or to prejudice [Beltran] with respect to his defense of this

_____

[15] In fact, while Beltran argues that the "fact that a different agency (DHS) within the same government had custody over Beltran while briefs were filed does not excuse the delay in prosecution–that is because the United States Marshals had previously taken [him] out of ICE custody to resolve a petition to revoke the supervised release in the Southern District of New York," [Doc. 47 at 3 (citations omitted)], this argument overlooks the fact that at the time of the issuance of the arrest warrant from the Southern District of New York on the petition, Beltran had just been referred to the Immigration Court in Atlanta for consideration of his application for deferral of removal under CAT and ICE appears to have elected to defer those proceedings and the immigration case was administratively closed while the Southern District of New York determined whether Beltran had violated the terms of his supervised release. See [Doc. 45-1 at 3 ¶¶ 8-10; Doc. 42-3; Doc. 42-4; Doc. 42-5]. Here, as the government points out, "by the time the government indicted Beltran in 2013, DHS already initiated the immigration proceedings" and "the issuance of the IJ's order after considering Beltran['s] deferral claim made Beltran's removal from the United States appear to be imminent." [Doc. 42 at 13-14 (citations omitted)]. Although Beltran contends that the government "has known that [he] would not be removed to Morocco since December 19, 2013, the date the [BIA] vacated the [IJ's] order," [Doc. 47 at 2 (citations omitted)], this contention likewise overlooks the fact that the BIA's order simply vacated the IJ's order that Beltran be removed to Morocco, but reminded ICE that it retained the authority to remove him to any safe country other than Algeria, [Doc. 45-1 at 4-5 ¶ 26; Doc. 32-3 at 10 ¶ 35; Doc. 32-4 at 5; Doc. 37-1], and that his removal therefore still seemed imminent.

indictment." <u>United States v. Ghailani</u>, 751 F. Supp. 2d 515, 534 (S.D.N.Y. 2010),

<u>aff'd</u>, 733 F.3d 29 (2d Cir. 2013); <u>see also</u> <u>United States v. Davis</u>, 231 F. Supp. 2d 701,

712 (S.D. Ohio 2002) (noting that there was "no evidence that the Government ha[d]

actually gained a tactical advantage, such that it [was] in any better a position to

prosecute [defendants] today than it was a few years ago").  That is, "mere 'inaction

in bringing the case is insufficient . . . to establish that the government's actions were

motivated by an attempt to gain a tactical advantage,'" <u>United States v. Randolph</u>,

Criminal Action File No. 4:11–CR–17–RLV–WEJ, 2011 WL 5921455, at *3 (N.D. Ga.

Nov. 2, 2011), adopted by 2011 WL 5925588, at *1 (N.D. Ga. Nov. 21, 2011) (alteration

in original) (citation omitted).  Rather, the record reflects that Beltran "want[ed] to

enjoy his liberty somewhere other than Algeria" and the government "want[ed] him

to enjoy his liberty somewhere other than the United States," and attempting to

effectuate his removal and thereby avoiding the firearm prosecution appears to have

aligned with both Beltran and the government's stated interests, [Doc. 42-14 at 9, 13].

Thus, the reason for the delay was "'more neutral' than would have been [a] delay

resulting from a deliberate attempt to manipulate the system to the detriment of

[Beltran's] defense in this case," and while the "'ultimate responsibility for' that

delay, [] nevertheless 'must rest with the government,' as the government rather

than [Beltran] brought it about," it does not weigh heavily against the government

under the unique circumstances presented here where both Beltran and the United States preferred that he be removed from the country. Ghailani, 751 F. Supp. 2d at 540 (footnotes omitted); see also United States v. O'Bryant, 775 F.2d 1528, 1532-33 (11th Cir. 1985). Therefore, the Court concludes that "the second factor does not weigh heavily against the government." Spaulding, 322 F. App'x at 947; see also United States v. Avalos, 541 F.2d 1100, 1113-15 (5th Cir. 1976).[16] However, even if the reason for the delay did weigh heavily against the government, the Court must still consider the third Barker factor and whether Beltran timely asserted his right to a speedy trial.

**B.**     **Beltran's Assertion of his Right to a Speedy Trial**

Beltran contends that he timely asserted his speedy trial right. [Doc. 32 at 15]. In particular, Beltran maintains that, although he was notified of the indictment and shown a copy of the arrest warrant issued in the Northern District of Georgia on June 12, 2014, after it was unsealed, he was unrepresented until January 3, 2017, at which time he was appointed counsel who then filed the present motion to dismiss on February 27, 2017, and this factor therefore weighs heavily against the government. See [id.]; see also [Doc. 47 at 4-5]. In response, the government

---

[16] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

contends that Beltran "acquiesced in the delay to assert his speedy trial right" because he was aware of the pending criminal charge in the indictment as of June 12, 2014, yet "continued his desire to be removed from the United States," despite Beltran and his various attorneys in the habeas matter having "numerous opportunities to assert his speedy trial right[.]"  [Doc. 42 at 16-19].[17]

"A defendant may invoke the right to a speedy trial after indictment, information, other formal charge, or upon arrest and holding to answer a criminal charge."  United States v. Taylor, 306 F. App'x 492, 493 (11th Cir. 2009) (per curiam) (unpublished) (citation and internal marks omitted).  "Where the defendant did not know of the indictment until arrest, [] he may promptly assert his right to a speedy trial after arrest, and it weighs heavily against the government."  Id. (citation omitted).  However, "[i]f the defendant knew of the indictment years before he was arrested and waited until arrest to invoke his right to a speedy trial, the third factor would weigh heavily against the defendant."  Id. (citation omitted); see also United States v. Velazquez, 749 F.3d 161, 184 (3d Cir. 2014) (identifying "knowledge of the

_____

[17] In support of this contention, the government points out that in August 2016, Beltran wrote a letter to Judge Hyles, expressing his concern over the length of his detention, especially since he was now being represented by a second attorney in the habeas matter since his first attorney was no longer with the federal defender program and his belief that ICE had provided no other solution other than to remove him to Morocco.  See [Doc. 42-16 at 2].  He requested Judge Hyles' "assistance on asking ICE to work a solution [for his removal] with [his] attorney."  See [id.].

indictment as the appropriate measure for the timely assertion of the speedy trial right"); Villarreal, 613 F.3d at 1355.

In the present case, it is undisputed that Beltran was aware of the indictment at issue in June 2014, after the government unsealed it and FBI agents met with him and showed him a copy of the arrest warrant.  See [Docs. 6 & 7; Doc. 42-17].  While the Court acknowledges that "a defendant does not forego his Sixth Amendment right to speedy trial by failing to seek his own arrest and prosecution" or "to call himself to trial, [Beltran's] failure to do so not only weighs against dismissal of this indictment, but underscores the [g]overnment's argument that its delay, while deliberate, was not motivated by a desire to obtain improper tactical advantage, and suited the interests of [Beltran] (as well as the United States) in resolving the [immigration case] prior to proceeding on the firearm[] charge[]."  United States v. Falcon, 930 F. Supp. 1510, 1515 (S.D. Fla. 1996) (citation omitted).  And, while Beltran "contends that his failure to assert his right earlier should not be weighted against him . . . because he had no attorney at the time to counsel him," his "assertion that he had no attorney at the time to counsel him is simply incorrect," United States v. Grimmond, 137 F.3d 823, 829 (4th Cir. 1998) (emphasis omitted), as he had counsel in the pending habeas matter, who was clearly aware of the federal indictment as indicated by his representations at the status conference before Judge Hyles, [Doc.

42-14 at 9], and "his failure to assert his right to a speedy trial should be weighted in favor of the [g]overnment," <u>Grimmond</u>, 137 F.3d at 829 (footnote and citation omitted).  Indeed, this case is the classic example of a defendant "raising his speedy trial right when it suited his interests but not when the delay benefited him." <u>United States v. Abad</u>, 514 F.3d 271, 275 (2d Cir. 2008) (per curiam).  "Because the record supports . . . that [Beltran] knew of . . . the charge[] contained in the [] indictment as early as [June 2014], the third factor also weighs against his speedy trial claim." <u>United States v. Tchibassa</u>, 452 F.3d 918, 926 (D.C. Cir. 2006); <u>see also</u> <u>United States v. Fernandes</u>, 618 F. Supp. 2d 62, 72 (D.D.C. 2009).[18]

## C.   <u>Actual Prejudice</u>

Because "the second [and third] *Barker* factor[s] do[] not weigh heavily against the [g]overnment, [Beltran] must show actual prejudice." <u>United States v. Cadet</u>, 521 F. Supp. 2d 1351, 1355 (S.D. Fla. 2007) (citation omitted); <u>see also</u> <u>Spaulding</u>, 322

---

[18] Because the Court finds that the third <u>Barker</u> factor clearly does not weigh heavily against the government, but in fact, weighs against Beltran, even if it is assumed that the first and second factors weigh heavily against the government, Beltran is not relieved of his burden to prove actual prejudice since all of the first three <u>Barker</u> factors do not weigh heavily against the government. <u>See</u> <u>Jones</u>, 2007 WL 2071267, at *23 (citation omitted); <u>see also</u> <u>United States v. Davenport</u>, 935 F.2d 1223, 1239 (11th Cir. 1991) (assuming without deciding that factors one and three weigh heavily against the government and noting that defendant "must either establish that the reasons for the delay weigh heavily in his favor, in which case he may not be required to show prejudice, or demonstrate prejudice to satisfy the fourth element of the *Barker* analysis").

F. App'x at 947 (citations omitted); <u>United States v. Burke</u>, 673 F. Supp. 1574, 1579-80

(N.D. Ga. 1986), <u>aff'd</u>, 856 F.2d 1492 (11th Cir. 1988) (per curiam) ("[I]n order for the

defendants to prevail on their Sixth Amendment claim, they must establish actual

prejudice resulting from the delay," since only the length of the delay weighed

heavily in the defendants' favor.).  In order to show actual prejudice, Beltran "must

demonstrate one of the following: (1) oppressive pretrial incarceration, (2) anxiety

and concern, or (3) possible impairment of his defense." <u>Spaulding</u>, 322 F. App'x at

947 (citation omitted).  And, Beltran "must proffer more than conclusory assertions

of prejudice or unsubstantiated allegations[.]" <u>Id.</u> (citation and internal marks

omitted).

Beltran does not specifically argue that he has suffered actual prejudice in this

case. <u>See generally</u> [Doc. 32].  Rather, in a footnote, he maintains that he "is not

required to show actual prejudice, but he can, given the faded recollection of

witnesses concerning alleged events from almost ten years ago," which he states

"will be developed in a reply." [<u>Id.</u> at 7 n.2].[19]  However, "[w]hile it is true that

_____

[19] In his reply, Beltran generally asserts that "the passage of time makes it more difficult to demonstrate actual prejudice with complete precision," and that his "'pre-trial' incarceration has been oppressive because there has been no foreseeable removal since [he] was granted CAT deferral and the BIA vacated the Morocco order." [Doc. 47 at 5-6 (citations and internal marks omitted)].  However, as the government points out, <u>see</u> [Doc. 42 at 21], "[a]rguments raised for the first time in a reply brief are not properly before a reviewing court," <u>Drayton v. United States</u>, Case Nos. CV615-036, CR612-018, 2016 WL 2646650, at *3 n.7 (S.D. Ga. May 9, 2016),

affirmative proof of particularized prejudice is not essential to every speedy trial claim, where the other factors do not indicate a constitutional violation, a defendant must show he suffered actual prejudice from the delay." United States v. Twitty, 107 F.3d 1482, 1490 (11th Cir. 1997) (citations and internal marks omitted). And Beltran's "mere conclusory allegation . . . is insufficient to show actual prejudice." Duke, 2011 WL 1833213, at *4 (citation omitted); see also United States v. Rosso, Civil Action File No. 3:14–CR–00014–TCB, 2015 WL 7115860, at *17 n.20 (N.D. Ga. Nov. 12, 2015), adopted at *9 (first and fifth alterations in original) (citation and internal marks omitted) (noting that the "mere possibility of prejudice . . . [was] not sufficient . . ., and the[] general claims of prejudice . . . [were] insufficient to satisfy [defendant's] exceedingly high burden of showing actual prejudice resulting from the delay"). Simply put, "the record does not indicate that [Beltran] suffered actual prejudice due to the delay." Harris, 376 F.3d at 1291 (footnote omitted). Indeed, Beltran "has offered nothing to suggest either that his defense was impaired during the delay or that he suffered some especial anxiety as a result of the delay." Id. at 1291 n.7; see also United States v. Smith, 318 F. App'x 780, 791 (11th Cir. 2009) (per curiam) (unpublished) (finding no Sixth Amendment right to a speedy trial violation and

---

adopted by 2016 WL 3101679, at *1 (S.D. Ga. June 1, 2016) (internal marks omitted) (quoting Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005)). Nevertheless, the Court will address Beltran's conclusory arguments of actual prejudice asserted in his reply brief.

noting that defendant's brief stated "only the conclusion that he suffered prejudice, without enumerating how or why").

In addition, although Beltran argues that his "'pre-trial' incarceration has been oppressive," [Doc. 47 at 6], he has only been incarcerated on the present indictment since January of 2017, see [Docs. 20, 21, 22, 23, & 24]; see also Barker, 407 U.S. at 534 (finding prejudice was minimal where defendant only spent 10 months in pretrial incarceration).[20]   Thus, Beltran's argument in this regard is without merit. Accordingly, it is **RECOMMENDED** that Beltran's motion to dismiss the indictment, [Doc. 32], be **DENIED**.

### III.  CONCLUSION

For the foregoing reasons and cited authority, the government's motion for leave to file a sur-reply, [Doc. 50], is **GRANTED**, and it is **RECOMMENDED** that Beltran's pending motion to dismiss the indictment, [Doc. 32], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

---

[20] Indeed, Beltran was in DHS custody for a majority of the time for his removal proceedings and his request for protection under CAT and not for the charge levied against him in the instant indictment, and "[t]he protections of the Sixth Amendment are [not] triggered [] by [his] . . . incarceration in other districts[.]" United States v. Elmardoudi, 611 F. Supp. 2d 857, 861 (N.D. Iowa 2007).

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 28th day of June, 2017.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

28