# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ADAM GHANI BELTRAN, a/k/a
Abdelghani Meskini, a/k/a Eduardo
Rocha, a/k/a "Johnny,"

                                    1:13-cr-2-WSD-RGV

                    Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant Adam Ghani Beltran's

("Beltran") [1] Objections [53] to Magistrate Judge Russell G. Vineyard's Final

Report and Recommendation [51] ("R&R") in which the Magistrate Judge

considered Beltran's Motion to Dismiss the Indictment [32].

## I.     BACKGROUND

Defendant Beltran is charged with unlawful possession of a firearm as a

convicted felon, in violation of 18 U.S.C. § 922(g)(1).  The felony conviction on

which the charge is based occurred on January 23, 2004, when Beltran pled guilty

---

[1]     On April 7, 2006, Beltran legally changed his name from Abdelghani
Meskini to Adam Ghani-Beltran.  ([42.2] at 2-3).  Although exhibits submitted by
the parties refer to Beltran by his birth name, the Court in this order refers to him
as Beltran.

in the United States District Court for the Southern District of New York to an

eight-count indictment, including a charge for a terrorism-related offense.

On February 27, 2017, Beltran filed his Motion to Dismiss the Indictment on

the grounds that his Sixth Amendment right to a speedy trial was violated when the

charge against him was not immediately brought to trial.[2]

A.     Factual and Procedural Background

On November 10, 2009, Beltran, a citizen of Algeria, was taken into custody

by Immigration and Customs Enforcement ("ICE") and served with a Notice of

Intent to Issue a Final Administrative Removal Order based on his aggravated

felony convictions in 2004.  (Ray Decl. [45.1] at 2; [45.2]).  Beltran did not contest

that he was removable, but contended his removal be withheld or deferred under

the Convention Against Torture ("CAT").  ([32.3] at 7-8; [45.2] at 3).  On

November 25, 2009, ICE issued its Final Administrative Removal Order, finding

Beltran "deportable as charged" to Algeria or Morocco, but delayed execution of

the order until Beltran could be interviewed about his application for deferral under

CAT.  ([45.1] at 2; [45.3]).

---

[2]     On June 8, 2017, the Government filed a motion for leave to file a sur-reply
to Beltran's reply brief.  ([50]).  The Magistrate allowed the sur-reply to be filed
based on the reasons cited in the R&R.  The Court agrees with the decision to
allow the sur-reply.

On December 9, 2009, an asylum officer interviewed Beltran and, on March 3, 2010, Beltran was referred to the Immigration Court in Atlanta, Georgia, for consideration of his deferral application. ([45.1] at 3).

On March 18, 2010, the United States Probation Office for the Southern District of New York filed a petition to revoke Beltran's supervised release, and the United States District Court for the Southern District of New York issued a warrant for his arrest. ([45.1] at 3; [42.3]; [42.5]). On March 24, 2010, Beltran was taken into custody and, as a result, on April 1, 2010, the proceedings before the Immigration Court in Atlanta, Georgia, were administratively closed. ([45.1] at 3; [42.4]).

On October 27, 2010, the United States District Court for the Southern District of New York found Beltran had violated the terms of his supervised release, including by attempting to possess a firearm in the spring or summer of 2007, attempting to purchase an AK-47 assault rifle in the summer or fall of 2009, associating with another felon from 2006 to November 2009, and making false statements in late 2009. Beltran was sentenced to thirty-one (31) months imprisonment followed by further supervised release. ([42.5] at 3-4; [45.1] at 3). On June 22, 2012, after his release from custody, Beltran was returned to ICE custody.

On June 26, 2012, ICE filed a motion with the Immigration Court in Atlanta to re-calendar Beltran's immigration proceedings and transfer venue over the proceedings to the Stewart Immigration Court. The motion was granted on August 16, 2012. ([45.1] at 3).[3] While the immigration proceedings were processing and Beltran was in immigration custody, on January 3, 2013, a federal grand jury in the Northern District of Georgia returned an indictment, charging Beltran with unlawfully possessing a firearm as a convicted felon from the fall of 2007 through February 1, 2008, in violation of 18 U.S.C. § 922(g). ([1]). An arrest warrant was issued when the indictment was returned. ([5]). Although an arrest warrant was issued, because Beltran already was in the custody of the Department of Homeland Security ("DHS"), the arrest of Beltran was not effected. The indictment was filed under seal. ([3]; [4]; [6]; [7]).

On March 12, 2013, the Immigration Court conducted a hearing on Beltran's application for asylum and withholding of removal, during which Beltran explained his reasons for opposing removal to Algeria. He consented at the hearing to removal to Morocco, where Beltran claimed to have citizenship through his father, a Moroccan national. ([45.4]; [45.1] at 4). On June 13, 2013, the

---

[3]     On August 23, 2012, Beltran was served with the November 25, 2009, Final Administrative Removal Order. ([45.3]).

4

Immigration Judge denied Beltran's asylum request but found him eligible for deferral to Algeria, instead ordering his removal to Morocco. ([45.4]; [45.1] at 4). ICE moved to reconsider, and on June 24, 2013, an amended decision was entered again granting Beltran's application for deferral of removal to Algeria, but allowing removal to Morocco. ([45.1] at 4; [45.5]). ICE appealed this decision to the Board of Immigration Appeals ("BIA"). ([45.1] at 4).

On August 8, 2013, ICE provided Beltran with travel documents for travel to Morocco, asked him to complete a packet of material relating to removal, and asked him to provide information regarding his father's Moroccan citizenship. On August 27, 2013, ICE mailed the travel document request to the Moroccan Consulate. ([45.1] at 4). ICE contacted the Moroccan Consulate on several occasions during the period October 31, 2013 to November 1, 2013, requesting a status report on the travel document request. ([45.1] at 4).[4] On May 22, 2014, ICE received an e-mail from the Moroccan Consulate, indicating that a travel document

---

[4]    On December 19, 2013, the BIA issued a decision dismissing ICE's appeal, but vacating as *ultra vires* the Immigration Judge's order that Beltran be removed to Morocco, reminding ICE that it retained the authority to remove him to any safe country other than Algeria ([45.1] at 4-5; [32.3] at 10; [32.4] at 5; [37.1]) and, following a hearing by the Immigration Court on January 13, 2014, the Immigration Judge issued a decision, granting Beltran's application for deferral of removal to Algeria under CAT, which became final on February 13, 2014, ([45.1] at 5; [32.3] at 10; [32.4] at 5).

could not be issued to Beltran without a Moroccan identification document or

documentation proving his citizenship.[5] ([45.6] at 5; [42.11]).

On February 18, 2014, Beltran filed his *pro se* petition for writ of habeas

corpus in the Middle District of Georgia, seeking release from detention. After

Beltran was appointed counsel in October 2014, he amended his petition, alleging

that his indefinite confinement was unconstitutional. ([42.18]); see also

Meskini v. Holder, Civil Action No. 4:14-cv-00042-CDL-MSH, at [1], [33] (M.D.

Ga. 2014).

At the end of May 2014, ICE asked its Headquarters Enforcement and

Removal Operations Travel Document Unit ("TDU") to help secure travel

documents for Beltran. TDU coordinated with other agencies to contact and

interview Beltran's family members and obtain documents to verify Beltran's

derivative Moroccan citizenship. (Gephart Decl. [42.12] at 3; Soto Decl. [42.13] at

2). TDU located Beltran's father in Algeria, but was unsuccessful in arranging an

---

[5]     The Moroccan Consulate's e-mail appeared to be based on Beltran's
statement in an August 2013 declaration that he had never been issued any type of
identification documentation from the Moroccan government. ICE had previously
obtained two letters written by Beltran in January 2010, in which he wrote the
Consulate of Morocco in New York and the Embassy of Morocco in Washington,
D.C., advising each office that he had received a Moroccan identification card in
the 1990 to 1991 time frame. ([45.6] at 5-6; [42.8]; [42.9]; [42.10]).

interview with him. ([42.13] at 2). On June 12, 2014, Special Agents with the Federal Bureau of Investigation ("FBI") met with Beltran. During the interview, agents showed him a copy of the arrest warrant issued in the Northern District of Georgia for the charge in the indictment. ([42.17]). In March and April of 2015, United States officials requested assistance from the Government of Algeria to locate and interview Beltran's father. The government of Algeria agreed to help. ([42.13] at 3).

While efforts were ongoing to secure travel documents for Beltran's removal to Morocco, on November 18, 2015, a status conference was held on Beltran's habeas petition in the Middle District of Georgia. ([42.14]). During the conference, Magistrate Judge Stephen Hyles stated that Beltran "want[ed] to enjoy his liberty somewhere other than Algeria" and that the "United States [did] not want to hold him for any particular reason" and "want[ed] him to enjoy his liberty somewhere other than the United States," but that he had "one impediment with [the] pending indictment in the Northern District." (Id. at 9). The Magistrate Judge said that it "seem[ed] . . . unfair to hold him for a certain period of time, and then right when he expect[ed] the door to come open, the U.S. Marshal Service [would] gather[] him up and take[] him to Atlanta[.]" (Id.).

The Government advised the Magistrate Judge that the indictment against

Beltran had been unsealed, was on the record, and that "if [the] Court grant[ed

Beltran's] habeas petition" and his immigration detention ended, Beltran would be

taken into custody based on his indictment returned in the Northern District of

Georgia.  (Id. at 9-10).  The plan was to keep Beltran detained until he was

removed from the United States because "he's an especially dangerous alien that

cannot be on the street."  (Id. at 10-11).  The Government also told the Magistrate

Judge:

> [T]here are a lot of cooks in the kitchen and a lot of decisions the
> government's making in its discretion. . . .  [T]he plan is to keep
> [Beltran] in detention until such time as he's removed from the United
> States because . . . he's an especially dangerous alien that cannot be
> on the street.  So however we need to do that, the United States is
> prepared to do it.
>
> Now, we prefer just to get him out of the United States, and he can
> have his life wherever else he wants to go.  And maybe we'll never
> prosecute him.  But if we have to pull that card out of the deck,
> then . . . .  [I]t's a tactical consideration the United States will make
> when required to do so.

Id. at 10-11.[6]

---

[6]     During the conference, Beltran's counsel also advised the Court that Beltran
was amenable to removal to Kuwait, explaining that his common law wife held
dual citizenship in Kuwait and the United States.  ([42.14] at 11-12).  Beltran's
counsel subsequently advised the Court during another status conference held on
September 13, 2016, that Kuwait was no longer an option because Beltran's

On December 21, 2016, the Magistrate Judge in the Middle District issued his Report and Recommendation, recommending that Beltran's amended petition for a writ of habeas corpus be granted and that he be released from ICE custody. ([32.4]). On January 3, 2017, Beltran was arrested on the warrant issued in the Northern District of Georgia when the indictment in this case was returned. ([24]).

On February 27, 2017, Beltran filed his Motion to Dismiss the Indictment. On June 28, 2017, Magistrate Judge Vineyard issued his R&R, recommending that Beltran's motion be denied. On July 12, 2017, Beltran filed four objections to the R&R. First, he claims the combined pre- and post-indictment delays were not

---

common law wife did not want to marry him, nor was she a citizen of Kuwait. ([42.15] at 7-8). Additionally, "the government received an attestation from the Moroccan Consulate in Algeria, affirming that [Beltran's] mother was, in fact, born in Morocco." (Id. at 10). As a result, ICE reached out to its attaché in France "to assist in trying to find out the nationality and prove the nationality of [Beltran's] father," since it was "believe[d] that France would have biographical documents of . . . people born in Morocco or citizen or naturalized in Morocco," which was at one time a French Protectorate. (Id. at 12). During the September 2016 status conference, the government also explained that Beltran's father had failed to respond to questions regarding his biographical information. (Id. at 10). The government further noted that Beltran was not cooperating and that he continued his efforts "to thwart his removal" to Morocco, (id. at 12, 14-15, 18-21), a contention that was disputed by defense counsel, (id. at 14-15). In an effort to help determine whether Beltran was thwarting his own removal, the Magistrate Judge inquired as to whether ICE could meet with Beltran to obtain the missing information regarding his father's citizenship, and Beltran's attorney indicated that he did not think Beltran would object to that. (Id. at 24-25).

properly evaluated in determining whether Beltran's Sixth Amendment Speedy Trial rights were violated.  ([53] at 1).  Second,  he objects on the grounds the Magistrate Judge failed to consider United States v. Ingram, 446 F.3d 1332 (11th Cir. 2006), in deciding if the single count returned against him warranted the extent of the delay of trial.  (Id. at 3).  Third, Beltran claims the order to remove him from the United States was not a neutral or valid reason for the pre-trial delay and that the R&R does not consider evidence of the Government's deliberate decision to allow the delay.  (Id. at 4).  Fourth, Beltran argues the R&R erroneously finds that "Beltran did not timely assert his speedy trial right."  (Id. at 8).  Beltran also "objects generally to the factual findings, legal analysis, and conclusions that are contrary to that presented by the motion. . . ."  (Id. at 1).

## II.    DISCUSSION

### A.    Legal Standard

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Williams v. Wainwright, 681 F.2d 732 (11th Cir. 1982), cert. denied, 459 U.S. 1112 (1983). A district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."

28 U.S.C. § 636(b)(1).  With respect to those findings and recommendations to which a party has not asserted objections, the Court must conduct a plain error review of the record.  United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983), cert. denied, 464 U.S. 1050 (1984).   Beltran asserted four specific objections to the R&R and the Court reviews them *de novo.*  Beltran's general objections to the "factual findings, legal analysis, and conclusions" are not proper objections and they are reviewed for plain error.  See Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988) ("Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to.  Frivolous, conclusive, or general objections need not be considered by the district court.").[7]

B.    Analysis

An accused has a fundamental Sixth Amendment right to a speedy trial in a criminal prosecution.  Klopfer v. North Carolina, 386 U.S. 213, 223 (1967).  This speedy trial right is "not primarily intended to prevent prejudice to the defense caused by the passage of time," an interest that "is protected primarily by the Due Process clause and statutes of limitations."  United States v. Macdonald, 456 U.S.

---

[7]    The facts, stated in this Order, are taken from the R&R and the record.  The parties have not objected to any specific facts in the R&R, and the Court finds no plain error in them.  The Court thus adopts the facts set out in the R&R.  See Garvey v. Vaughn, 993 F.2d 776, 779 n.9 (11th Cir. 1993).

1, 8 (1982). "The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." Id.

"The Sixth Amendment right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of trial." United States v. Knight, 562 F.2d 1314, 1323 (11th Cir. 2009); United States v. Treisback, No. 12-CR-00026-RWS, 2014 WL 2003013, at *4 (N.D. Ga. May 14, 2014). "A defendant's Sixth Amendment right to a speedy trial cannot be quantified into a specific number of days or months[, but] must be evaluated under the particular circumstances of each case using a balancing test which weighs the conduct of both the government and the defendant." United States v. Spaulding, 322 F. App'x 942, 945 (11th Cir. 2009) (citation omitted).

In evaluating if a defendant's speedy trial right was violated after an indictment was returned, and to perform the balancing analysis required, the Court considers four factors: (i) the length of the delay, (ii) the reason for the delay, (iii) the defendant's assertion of the speedy trial right, and (iv) prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 530 (1972); United States v. Villarreal,

613 F.3d 1344, 1350 (11th Cir. 2010), see also United States v. Lamar,

562 F. App'x 802, 805 (11th Cir. 2014). "When balancing the Barker factors,

courts must articulate 'how heavily each factor weighs against the identified

party.'" United States v. Duke, No. 4:11-CR-004, 2011 WL 1811439, at *3 (N.D.

Ga. Apr. 27, 2011) (quoting United States v. Ingram, 446 F.3d 1332, 1336 (11th

Cir. 2006)). "In the Eleventh Circuit, 'a defendant generally must show actual

prejudice unless the first three factors . . . all weigh heavily against the

government.'" Id. (quoting United States v. Dunn, 345 F.3d 1285, 1296 (11th Cir.

2003)).

The purpose of the Barker criteria is to evaluate the relative responsibility

for the delay and how the responsibility of each party relates to the time to get a

defendant to trial. Here, Beltran asserts four objections to the findings and

recommendations in the R&R, fundamentally objecting to the way in which the

Magistrate Judge weighed the Barker factors.

1.   Objections 1 and 2: Combined pre- and post-indictment delays
      not properly evaluated (Objection 1) and the Magistrate Judge's
      failure to consider United States v. Ingram (Objection 2)

Beltran argues that the Magistrate Judge failed to consider the

pre-indictment delay in weighing the Barker length of delay factor. In support of

his argument, Beltran relies on a quotation from the Eleventh Circuit opinion in

Ingram, which he takes out of context, and misquotes by leaving out an important word. Beltran also argues that the charge against him in this case was a "non-complex, ordinary street crime," as it was in Ingram, and that this fact was not considered in determining the weight to be given to the post-indictment delay in this case. Beltran claims that the following information should have been, but was not, considered in the R&R: "(1) the post-indictment delay began *five years* after the alleged criminal act; (2) Beltran was in custody for the entire length of the delay; (3) the government was aware that Beltran was in its custody; (4) the indictment . . . alleged a single, non-complex offense; and (5) the conceded, four-year post-indictment delay in Beltran's case is *twice as long* as the delay held unconstitutional in Ingram." ([53] at 3-4).

The Eleventh Circuit in Ingram stated the long-established principle that "[o]nly pretrial delay following a person's arrest, charge, or indictment is relevant to whether the Speedy Trial Clause of the Sixth Amendment is triggered." Ingram, 446 F.3d at 1339 (citing United States v. Lovasco, 431 U.S. 783, 788-89 (1977) (holding pre-indictment delay is "wholly irrelevant" to whether the Sixth Amendment speedy trial analysis is engaged)). Beltran offers this quote from Ingram: "[O]nce the Sixth Amendment's speedy trial analysis is triggered, it is appropriate to consider [inordinate] pre-indictment delay in determining how

heavily post-indictment delay weighs against the Government." Id. at 1339; ([53] at 1-2). Beltran failed to acknowledge that the quote limits consideration of pre-indictment delays to those that are "inordinate" and that inordinate pre-indictment delay applies, if at all, to what weight to give delay prejudice in the Barker weighing evaluation. That is, a pre-indictment delay when tacked onto post-indictment delay is not alone sufficient to find a Sixth Amendment speedy trial violation.

There are two analyses required in evaluating the length of delay. The first is whether the "interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." Ingram, 446 F.3d at 1339 (citation omitted). The second factor requires examination of "the extent to which the delay stretches beyond the bare minimum to satisfy the threshold showing of presumptive prejudice." Villarreal, 613 F.3d at 1350 (citing Doggett, 505 U.S. at 652). "The length of the delay itself weighs against the government, incrementally increasing in weight as the delay becomes increasingly protracted." Id.

In this case, the Magistrate Judge found that the delay between indictment and arrest was "presumptively prejudicial." This Court, and presumably the Magistrate Judge, considers the length of delay factor to be presumptively

prejudicial and one that weighs against the Government. The coupling of pre- and post-indictment delay is not, as Beltran appears to argue, sufficient to find conclusively that a speedy trial violation occurred. It is only one of four factors the Court must weigh. Beltran's objection to the Magistrate Judge's consideration of the pre-indictment delay is, upon *de novo* review, overruled.

Furthermore, the Magistrate Judge did not ignore the pre-indictment delay facts. The Magistrate Judge was aware of, and considered, the pre-indictment delay alleged by Beltran. At footnote 13 of the R&R, the Magistrate Judge considered Beltran's argument for dismissal based on "inexcusable pre-indictment delay" in seeking an indictment. The Magistrate Judge concluded that the pre-indictment delay did not cause Beltran actual prejudice and did not warrant dismissal of the indictment. (R&R at 15 n.13); United States v. Jones, 592 F.App'x at 921. The Magistrate Judge also considered that Beltran was initially detained on November 10, 2009, but by immigration officials, because Beltran has been convicted of aggravated felony offenses in 2004 and was subject to deportation. The Magistrate Judge further considered that Beltran had his supervised release revoked for violation of release conditions imposed as a result of his conviction in the Southern District of New York. Beltran's supervised release was revoked based on his attempted possession of a firearm, attempted

purchase of an assault rifle, his association with another felon, and his making of false statements. The status of his detention by immigration officials and for his supervised release violations was discussed at length in the R&R. The Magistrate Judge did not ignore it. (See R&R at 2-10). Upon *de novo* review, the Court finds Beltran's pre-trial detention was not the result of deliberate action by the Government relating to this prosecution and, in fact, resulted from Beltran's own conduct.

Beltran's first two objections assert that the length of his pre-trial detention weighs heavily against the Government. (See, e.g., [53] at 4).[8] Here, the Magistrate Judge found the delay length was presumptively prejudicial and the Court agrees the length of it weighs against the Government. The Court will assume, for the purposes of its analysis, that the length of the delay weighs heavily against the Government.

---

[8] To the extent Beltran claims Ingram requires dismissal of his indictment on other grounds, or requires that other Barker factors be found to weigh heavily in his favor, his argument fails because the facts here are materially different than those in Ingram. As explained later in this Order, Beltran's prosecution was delayed because removal proceedings were pending against him, and Beltran was aware of his indictment for years before he asserted his speedy trial rights.

2.      Objection 3:  Delay based on the immigration proceedings and
        the prospect for removal

In Objection 3, Beltran claims the reason for the post-indictment delay is not

excusable and it too should weigh heavily against the Government.  Beltran argues

the Magistrate Judge erred in not making this finding.  The Court disagrees.

The Government has the burden to establish valid reasons for the delay.  See

Villarreal, 613 F.3d at 1351.  Different reasons are given different weight.

"[A] deliberate attempt to delay the trial in order to hamper the defense is weighted

heavily against the government."  Id.  Neutral reasons for delay, such as negligence

or overcrowded courts, may be considered because the Government is responsible

for these circumstances, but these delays are weighted less heavily than improper

delays.  Id.  A valid reason, such as a missing witness, justifies an appropriate

delay.  Id.

On November 10, 2009, Beltran was detained on an order of removal based

on aggravated felony convictions returned against him in 2004.  On

March 24, 2010, Beltran went from immigration detention to the custody of federal

law enforcement authorities when he was arrested for violating the terms of his

supervised release, including by attempting to possess a firearm, attempting to

purchase an AK-47 assault rifle, associating with another felon, and making false

statements.  His supervised release was revoked and he was sentenced to serve

thirty-one (31) months imprisonment.  When he was released from federal custody on June 22, 2012, Beltran was returned to immigration detention.  Beltran continued to challenge his immigration order of removal and continued in detention.

On January 3, 2013, Beltran was indicted on the charge pending in this action, specifically unlawful possession of a firearm.  An arrest warrant also was issued and the indictment was sealed.  Beltran's immigration case moved forward as immigration officials and the immigration court determined whether Beltran should be removed and, if so, to which country.

On February 18, 2014, Beltran filed, in the United States District Court for the Middle District of Georgia,[9] his *pro se* petition for a writ of habeas corpus for his release from immigration custody.  On June 2, 2014, the indictment in this case was unsealed.  On June 12, 2014, Special Agents with the FBI met with Beltran and showed him the warrant for his arrest on the indictment in this case.  The processing of Beltran's immigration case proceeded and Beltran remained in immigration detention.

---

[9]    Defendant apparently was held in immigration detention in the Middle District of Georgia.

About a year and a half later, a Middle District of Georgia Magistrate Judge conducted a hearing on Beltran's habeas petition. During the course of the hearing, an Assistant United States Attorney was asked why the Government had not moved forward on the charge on which Beltran was indicted in the Northern District of Georgia. The Government responded:

> [I]f this Court grants [Beltran's] habeas petition and his immigration detention must end, the Marshals will, therefore, take him into custody pursuant to his indictment up in the Northern District of Georgia, and he will be then prosecuted. . . .

> [T]here are a lot of cooks in the kitchen and a lot of decisions the government's making in its discretion. . . . [T]he plan is to keep [Beltran] in detention until such time as he's removed from the United States because . . . he's an especially dangerous alien that cannot be on the street. So however we need to do that, the United States is prepared to do it.

> Now, we prefer just to get him out of the United States, and he can have his life wherever else he wants to go. And maybe we'll never prosecute him. But if we have to pull that card out of the deck, then . . . . [I]t's a tactical consideration the United States will make when required to do so.

([42.14] at 8-11).

In Ingram, the Court recognized that in considering the Barker factors, each case has to be considered on its own. The facts here are unique. Before and after he was indicted, Beltran was detained in immigration detention. Even while there, he was told of the indictment and the warrant for his arrest. The Government

delayed the prosecution of this action including because so long as Beltran was in immigration detention, the Government was satisfied he would not be a threat to the public. The Government envisioned that Beltran ultimately would be removed and prosecution avoided, a result Beltran preferred. The record does not show that the Government was dilatory or acted in bad faith in delaying prosecution of the charges—a delay that held the prospect that Beltran may not have to respond to the charges if, as he and the Government hoped, he was removed from the United States. That said, the Court finds the Government's decision not to move forward on its prosecution of Beltran, even if it was for a purpose expected to benefit Beltran and which he desired, was still a decision the Government made. The delay, therefore, was caused in large part by the Government and the reason for delay weighs against it, although not heavily. Beltran's objection to the Magistrate Judge's finding that the reason for the delay does not weigh heavily against the Government is overruled.

      3.    <u>Objection 4: The timeliness of Beltran's assertion of his speedy trial right</u>

The Magistrate Judge found that Beltran's delay in asserting his Sixth Amendment speedy trial right weighs heavily against him. The Court concludes this finding is sound and well-reasoned. Beltran was made aware by federal agents on June 12, 2014, of his indictment and the warrant for his arrest on the charge

against him.  Sometime in October 2014, counsel was appointed to represent Beltran in his habeas action and this counsel and Beltran were present at the November 18, 2015, status conference conducted by the Magistrate Judge in the Middle District of Georgia.  It was at this conference that the Government said it was content not to arrest and prosecute Beltran on the pending charges, that it was satisfied with his current immigration detention, and that the "various cooks" involved in the case in this district ultimately were willing to let Beltran live in the country to which he would be removed and, if and when that occurred, Beltran could avoid prosecution.

The Court here has found that the Government decided to delay prosecution of Beltran until a decision was made on his removal and the Court now also finds that Beltran made his own strategic decision not to demand trial.  Indeed, it would not be in Beltran's interest to demand something that he might avoid completely. The Court finds that Beltran's decision not to request a speedy trial until he was arrested on the warrant, and only then to demand his speedy trial rights, weighs against Beltran, and does so heavily.  The Court overrules his objection based on the Magistrate Judge's finding on the timeline of Beltran's assertion of his speedy trial rights.

4.    <u>Weighing the Barker factors</u>

The Magistrate Judge considered each of the <u>Barker</u> factors, determined against which party each weighs and whether they do so heavily.  The Magistrate Judge found (1) that there was presumptive prejudice, (2) that the reason for delay weighed against the Government, and (3) that Beltran's late assertion of his speedy trial rights weighs against Beltran.  Because the Court does not find that all of the first three factors weigh heavily against the Government, the Court must now consider and evaluate the fourth factor—whether Beltran suffered actual prejudice by the delay in bringing the charge to trial.  <u>Ingram</u>, 446 F.3d at 1336.  The Court finds that Beltran cannot demonstrate that he was prejudiced and the evidence is that he declined to demand a jury trial until well after he learned of his indictment and he did so because the delay offered him a benefit, not prejudice.

As Beltran points out in his objections, the charge here is relatively straightforward and simple.  He is charged as a felon in possession of a firearm. Whether he was a felon at the time of possession requires simple evidence and whether he possessed a weapon at the time alleged also requires a straightforward presentation.  Beltran does not present any argument that he was prejudiced, relying instead on a finding that the second and third factors weigh heavily against the Government which, he argues, require that the charges against him be

23

dismissed.  Id.  Because the Court finds that the third factor weighs heavily against Beltran and Beltran has not demonstrated actual prejudice, he has not suffered a violation of his Sixth Amendment right to a speedy trial.

**III.    CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Adam Ghani Beltran's Objections to the Report and Recommendation [53] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Magistrate Judge Russell G. Vineyard's Final Report and Recommendation [51] is **ADOPTED** except that the Court finds that the first Barker factor weighs heavily against the Government and the third Barker factor weighs heavily against Beltran.

**IT IS FURTHER ORDERED** that Defendant Adam Ghani Beltran's Motion to Dismiss the Indictment [32] is **DENIED**.


**SO ORDERED** this 8th day of August, 2017.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE